## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **RENIEL ADRIAN MEYLER,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. JKB-23-00082** |
| **MAYOR AND CITY COUNCIL OF OCEAN CITY, *et al.*,** | * | |
| **Defendants.** | * | |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## MEMORANDUM

Plaintiff Reniel Adrian Meyler has brought this action against the Mayor and City Council of Ocean City ("Ocean City" or the "City"),[1] and Ocean City police officers Matthew Foreman and Jonathan D. Norris. Plaintiff's claims stem from an incident in the early morning hours of July 1, 2022 in Ocean City, Maryland, during which the Officers arrested him and the City detained him for several hours (the "July 2022 incident"). In the six-count Complaint, Meyler alleges violations of the United States Constitution pursuant to 42 U.S.C. § 1983, as well as violations of the Maryland Declaration of Rights and various Maryland torts.

Now pending before the Court are Defendants' Motion for Summary Judgment (ECF No. 36) and Motion in Limine (ECF No. 38). The Motion for Summary Judgment will be granted in part and denied in part, and the Motion in Limine will be denied as premature. Because the sole surviving claim is grounded in state law, the Court will decline to exercise its supplemental jurisdiction and will dismiss that claim, without prejudice to Meyler refiling the claim in the

---

[1] The Clerk will be directed to update the case caption on the electronic docket to reflect this name, given the City's assertion that it was "improperly named" in the Complaint as "Town of Ocean City," which it states is "a non-entity." (ECF No. 28 at 1.)

appropriate state court.  Also pending are two Motions for Leave to File Physical Exhibits, one filed by Meyler (ECF No. 40) and one by Defendants (ECF No. 37).  These Motions will be granted, and the Court will consider evidence from these physical exhibits in evaluating the Summary Judgment Motion.

## I.    FACTUAL BACKGROUND

The following facts are not in dispute.

Meyler is a Black Jamaican man who moved to the United States in April 2021.  (Meyler Dep. at 8 (ECF No. 39-8 at 3)[2]; ECF No. 7 at 1 (Defendants admitting that Meyler is a Black male).)  He has two school-aged children, who live in Jamaica but visit him regularly in the United States.  (Meyler Dep. at 19–21, 26.)  At the time of the July 2022 incident, Meyler was married, but his relationship deteriorated after the incident.  (*Id.* at 14–15.)  Meyler and his wife separated in September 2022 and were in the process of divorcing as of August 2023.  (*Id.*)  At the time of the incident, he worked for a company called BK Merchandizing in Ocean City, at a store called the T-Shirt Factory.  (*Id.* at 10, 30–32.)

On June 30th into the early morning hours of July 1, 2022, Meyler was working at the T-Shirt Factory.  (*Id.* at 49.)  After closing the store at around 1:00 or 1:30 a.m., Meyler went over to the nearby Cork Bar on Wicomico Street in Ocean City with several of his friends.  (*Id.* at 49, 57; Bernier Dep. at 30–31 (ECF No. 36-4 at 5).)  Meyler regularly visited this bar after work to socialize with friends and play pool.  (Meyler Dep. at 49–51.)  On July 1, 2022, however, Meyler did not play any pool, although he did have one beer.  (*Id.* at 58.)

By the time Meyler got to the bar, the night was already winding down, as the bar's closing

---

[2] The first time a deposition transcript is cited, the citation will include both the deposition transcription pagination and the ECF pincite.  Subsequent citations to that deposition transcript will refer solely to the deposition transcript pagination, unless otherwise noted.

time was 2:00 a.m. (Bernier Dep. at 37–38.) Sometime around 2:00 a.m., Meyler and his friends Yokimba Bernier and Christopher Clarke left the bar.[3] (*Id.* at 40.) Meyler and Bernier went over to Bernier's car—which was parked on the street outside the bar—while they waited for Clarke to return from going on a walk with another friend. (*Id.* at 40–41.) While waiting in the car, Bernier turned up the radio so that the music was playing loudly. (*Id.* at 41; Meyler Dep. at 59.)

The loud music drew the attention of two police officers. (Bernier Dep. at 43; Meyler Dep. at 59; ECF No. 36-11 at 9.) When Bernier saw the officers approaching the car, he turned down the music. (Bernier Dep. at 44.)

One of the responding officers, Officer Foreman, was mounted on a police horse named Moose. (ECF No. 36-11 at 9.) Footage from a body camera mounted on Foreman captures much of what happened next. (*See* Foreman Body Camera Video, Ex. A to Defendants' Motion for Summary Judgment (ECF No. 36-2); Ex. 3 to Plaintiff's Response in Opposition (ECF No. 39-6) (hereinafter "Foreman Video").)[4]

By the time Foreman arrived at the scene at 2:29 a.m. (according to the video's timestamp), Meyler, Bernier, and several bystanders were standing on the street next to Bernier's car. (Foreman Video.) Foreman, while mounted on Moose, rode up to Meyler and Bernier, while another horse-mounted officer circled around to the other side of Bernier's car and shone his flashlight on the scene. There is no audible music, consistent with Bernier's and Meyler's testimony that the music was turned off when the officers arrived. (*Id.*)

---

[3] The parties sometimes spell the name "Clark" instead of "Clarke"; the Court will assume that "Clarke" is the correct spelling because that is how his name is printed in his deposition. (Clarke Dep. (ECF No. 39-40).)

[4] Exhibit A to Defendants' Motion and Exhibit 3 to Plaintiff's Response in Opposition are identical; they are copies of the same body camera footage recorded by Foreman as he was riding the police horse Moose. Another body camera video proffered by Plaintiff shows the scene from the perspective of a different officer who was on the scene but not actively participating; this other video does not shed any additional light on the circumstances leading to Meyler's arrest, and is generally less helpful than the Foreman video because it was recorded at a greater distance from the relevant events. (*See* Ex. 4 to Plaintiff's Response in Opposition (ECF No. 39-7).)

3

Immediately upon Foreman's arrival at the scene, the following exchange took place. (*Id.*)

Foreman:   Where in the world do you guys think this is OK at 2 o'clock in the morning?

Meyler:   Jamaica.

Foreman:   Well then go back to Jamaica, cause you can't do it here.

Bernier:   [Inaudible]

Foreman:   We can hear you [from] three blocks away, and you can go to jail for noise in Ocean City.  OK?  You guys really wanna go to jail for noise?

Bernier:   [Inaudible]

Foreman:   No, not a ticket, jail.  Like, handcuffs.  Jail.  Noise.

Afterwards, about 30 seconds pass during which Meyler, Bernier, and an unidentified woman stand on the street.  There is conversation, but it is inaudible.  During this period, a white man walks up to Foreman, and says "thanks for letting me know."  Foreman asks the white man if the car is his, and the man says no, then continues to mill around nearby. (*Id.*)

At about 1 minute and 50 seconds into the video (at approximately 2:30:40 a.m.), Meyler turns toward Moose and makes some clicking sounds.  Moose does not immediately react, but about five seconds later he visibly moves his head and appears to take a step or two in response to the clicking, after having previously been still.  Foreman's hands can then be seen briefly pulling on the reins to stop Moose's movement; after that point (at about 2:30:49 a.m.) Moose appears calm and still again, and remains calm for the remainder of the video. (*Id.*)

Foreman, Bernier, and Meyler continue to argue over the noise issue for another 30 seconds, approximately.  In response to either Bernier or Meyler, Foreman says "no, no, you don't wave your hands at me, boom boom boom you go to these."  As he says "boom boom boom" Foreman takes out a pair of handcuffs and brandishes them in front of Meyler and Bernier, implying that they will be arrested.  Then, at about 2:31:15 a.m., Meyler makes another series of

4

clicking noises while looking at Moose. Foreman says, "stop antagonizing my horse. You're not allowed to do that. You can't interrupt my animal." During this period, Moose moves his head slightly, but it is not clear from the video whether this movement is in response to Meyler's clicking noises. (*Id.*)

Meyler and Bernier respond by stating that they see people freely interact with the police horses on the Ocean City Boardwalk. Foreman responds, "yeah, not when we're dealing with them." After Foreman tells Bernier to stop "screaming" at him, Bernier responds that he knows what Foreman is saying. Foreman then replies, "no, you're *going* to understand what I'm saying when you go to jail." (*Id.*)

Bernier then advises Meyler, "know your rights, you don't go to jail for this shit, I'm just saying. Because that [clicking noise], that doesn't mean shit. I'm just telling you, I've seen people pet their horses on the boardwalk, and shit like that." "Exactly!" Meyler responds, "in front [of] my store!" (*Id.*) While Bernier continues to talk about how people are allowed to pet the police horses, Foreman repeats "you're not allowed to antagonize the animal." (*Id.*)

Bernier repeats to Meyler that he cannot go to jail for making clicking noises toward the horse. Foreman warns him, "do it one more time and I'll [inaudible] show you, you can go to jail for it. You can't antagonize my animal." (*Id.*) Bernier asks, "what's the charge?" Foreman responds, "you'll find out when you read your charges." (*Id.*) Foreman then warns Meyler, "don't do it again." Bernier continues arguing with an off-camera individual about the music and the horse for another approximately 30 seconds. (*Id.*)

Then, at 2:32:56, Meyler again turns toward Moose and makes a clicking sound. Foreman immediately announces "ten ninety five! Pink shirt, ten ninety five." Two other officers on foot— who had since arrived on the scene—then walk over to Meyler. One of them—later identified as

5

Officer Norris—handcuff him. (*Id.*; ECF No. 36-7 at 3 (Norris Statement).) Foreman is Norris's immediate supervisor. (ECF No. 36-7 at 3.)

Foreman states that Meyler is under arrest and going to jail. Meyler turns to Foreman and asks, "for what?" Foreman responds, "antagonizing my animal!" Meyler responds, "I did not!" then falls silent. (Foreman Video.)

The video then shows Norris and another officer walk Meyler toward a nearby police wagon, where they search his pockets and advise him that the encounter is being recorded. Meanwhile, Foreman can be heard making a clicking noise, and then Moose starts walking forward. Foreman follows the officers and Meyler from behind for about 30 seconds, until coming to a stop at the rear of a police wagon. As Meyler is being searched in front of the police wagon, one of the officers who handcuffed Meyler tells him that it is illegal to antagonize a police animal. Foreman then says to Meyler, "it's interfering with a police animal. And [inaudible] I told you multiple times not to do it. All you had to do was not do it and you continued to do it." (*Id.*)

Foreman then explains to Meyler, as he is waiting to be loaded into the wagon, that "people are allowed to pet the horse, and talk to the horse, *after* we're dealing with something. But when we're in the middle of something you don't do it. If we were stopped and you came up and we were out there and you asked about the horse, sure, not a problem. But when we're in the middle of a call, and I ask you to stop antagonizing him, and you argue with me, and you continue [to] antagonize him." Meyler responds that he was not near the horse and he did not touch the horse. The officers then load Meyler into the back of the wagon, and the video ends shortly thereafter, at approximately 2:38 a.m. (*Id.*)

Meyler was in the police wagon for about 15 or 20 minutes while it drove around. (Meyler Dep. at 116.) At some point during this journey, the vehicle stopped, and officers opened the back

6

door and asked Meyler some more questions. (*Id.* at 116–17.) Meyler was then taken to the police station, booked, and placed in a cell. (*Id.* at 73–74.) Later that morning, he was taken before a commissioner (*id.* at 73), who, under Maryland law, is authorized to make probable cause determinations, Md. Code Ann., Cts. & Jud. Proc. § 2-607(c)(1). The booking report, which is dated July 1, 2022, at 4:45 a.m., states that Meyler was arrested for failure to obey a lawful order and interference with a police animal. (ECF No. 36-9 at 2.) He was released on his own recognizance that same morning, around 7:15 a.m. (*Id.* at 3–4; Meyler Dep. at 117.) The charges against Meyler were *nol prossed* (*i.e.*, voluntarily dismissed) just over a month later, on August 3, 2022. (Meyler Dep. at 75; ECF No. 39-17.)

Meyler states that he suffered hand abrasions, numbness, and back pain as a result of being handcuffed. (ECF No. 39-9 at 3.) He also states that, as a result of the July 2022 incident, he has suffered a "constant headache," as well as anxiety, depression, insomnia, lost wages, marital problems, and "shame and anguish for his children." (*Id.* at 3–4.) Finally, Meyler has had to move from Ocean City to Lanham, Maryland because of his ongoing fear of the Ocean City police. (*Id.*)

Meyler filed this action in this Court in January 2023. (ECF No. 1.) In the Complaint, he alleges violations of the United States Constitution pursuant to 42 U.S.C. § 1983 (Count I), violations of the Maryland Declaration of Rights (Count II), false arrest (Count III), false imprisonment (Count IV), assault and battery (Count V), and malicious prosecution (Count VI). Count I is brought against only Foreman and Norris; the other Counts are brought against all Defendants.

## II.    SUMMARY JUDGMENT LEGAL STANDARD

A party seeking summary judgment must show that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A

genuine dispute of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the nonmovant, but the "mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48 (1986). If the movant meets this burden, the nonmovant cannot rely solely on allegations in its pleadings to defeat the motion but must point to specific facts in the record that show the existence of a genuine factual dispute. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). The Court views the evidence in the light most favorable to the nonmovant and draws all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

There is an "added wrinkle" to the summary judgment standard in cases, such as this one, where the record contains video evidence capturing the event in question. *Scott v. Harris*, 550 U.S. 372, 378 (2007). When there is such video evidence—and when there is no allegation that the video has been altered or is otherwise inaccurate—the Court must "view[] the facts in the light depicted by the videotape." *Id.* at 381. In other words, the Court should credit the video's depiction of the events, even if that depiction contradicts other evidence submitted by the nonmovant. *Hall v. Wash. Metro. Area Trans. Auth.*, 33 F. Supp. 3d 630, 632 (D. Md. 2014). However, if the video evidence is unclear or ambiguous, then the Court must adopt the nonmovant's version of events. *Id.* (citing *Scott*, 550 U.S. at 381).[5]

## III.   SUMMARY JUDGMENT ANALYSIS

Defendants raise several arguments in support of their Summary Judgment Motion. As for Count I, Defendants argue that Meyler fails to show that he was subjected to any deprivation of

---

[5] The Fourth Circuit has emphasized that "*Scott* is the exception, not the rule," and that courts should only credit video evidence over a plaintiff's account opposing summary judgment if the video shows that the plaintiff's account is "blatantly and demonstrably false." *Harris v. Pittman*, 927 F.3d 266, 276 (4th Cir. 2019) (quotation omitted). Here, the parties do not meaningfully dispute the underlying facts surrounding the July 2022 incident. Accordingly, the Court can properly rely directly on its interpretation of the video evidence, as the Court's interpretation of the evidence does not differ from Plaintiff's account of the event—or, for that matter, the Defendants' account. Of course, the parties differ sharply in their opinions about the legal significance of the events shown in the video.

his Constitutional rights and that, even if there were any such violations, Defendants are nevertheless entitled to qualified immunity because the rights were not clearly established at the time of the July 2022 incident. (ECF No. 36-1 at 9.) As for Counts II through VI, which allege violations of the Maryland Constitution and various torts, Defendants argue (1) that the claims are barred by various forms of state law immunity, and (2) that the arrest was not wrongful in any event, since it was supported by probable cause.

The Court will begin by considering questions of immunity. Then, the Court will analyze the question of probable cause because, as will be explained in more detail below, the question of whether probable cause existed for Meyler's arrest is dispositive as to most of his claims—if there was probable cause for the arrest, then neither his federal nor his state law claims are viable, save one. Finally, the Court will address each of Meyler's claims in turn.

## A. State Law Immunities

Before turning to the merits of Meyler's state law claims (Counts II–VI), the Court will consider Defendants' arguments that they are entitled to various state law immunities. As the Court will explain, some—but not all—of their immunity arguments are correct.

First, Defendants argue—and Meyler concedes—that Meyler's state common law tort claims (Counts III–VI) against the City are barred by municipal immunity. (*See* ECF No. 39-1 at 20.) "Maryland law is well settled that a county (or municipality) generally enjoys immunity against common law tort liability arising out of acts that are governmental, as opposed to acts that are private or proprietary." *Clarke v. Prince George's Cnty.*, 65 A.3d 785, 790 (Md. Ct. Spec. App. 2013) (citing *DiPino v. Davis*, 729 A.2d 354, 370 (Md. 1999)). Accordingly, the Court will grant summary judgment in the City's favor with respect to Counts III, IV, V, and VI.

Next, Defendants argue that both the City and the officers are entitled to the protection of

9

common law public official immunity with respect to all of Meyler's state law claims (Counts II–VI). (ECF No. 36-1 at 12, 14.) This argument is unavailing. Meyler makes allegations of intentional misconduct, and "public official immunity does not apply to intentional torts." *Houghton v. Forrest*, 989 A.2d 223, 228 (Md. 2010) (holding that public official immunity does not apply to claims of assault, battery, false arrest, false imprisonment, and violations of Articles 24 and 26 of the Maryland Declaration of Rights). Therefore, the Court will not grant summary judgment in favor of Defendants on this ground with respect to any claims.

Similarly, Defendants are not entitled to statutory public official immunity under Md. Code Ann., Cts. & Jud. Proc. §5-507(a). Section 5-507 "is merely a codification of existing common law public official immunity." *Fletcher v. Prince Georges Cnty.*, 2017 WL 3302405, at \*8 n.14 (Md. Ct. Spec. App. Aug. 3, 2017). Therefore, § 5-507 does not provide immunity for intentional torts or intentional violations of the Maryland Declaration of Rights. *Hicks v. Anne Arundel Cnty.*, Civ. No. JKB-20-00022, 2021 WL 4804017, at \*4 (D. Md. Oct. 14, 2021). Accordingly, Defendants are not entitled to the protection of statutory public official immunity.

In sum, before turning to the merits of Meyler's underlying claims, the Court holds that: (1) the City is entitled to municipal immunity with respect to Counts III–VI; and (2) none of the Defendants is entitled to common law or statutory public official immunity.

## B. Whether There Was Probable Cause for Meyler's Arrest

Under both federal and Maryland law, all custodial arrests must be supported by probable cause. *Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019); *Ross v. Early*, 899 F. Supp. 2d 415, 431 (D. Md. 2012).

An officer has probable cause to make an arrest when there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable

caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)) (alteration in original); *see also United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011) ("An assessment of the presence of probable cause must be based on the totality of the relevant circumstances[.]"). A finding of probable cause "requires more than bare suspicion," but does not require the existence of "evidence necessary to convict." *Humbert v. Mayor & City Council of Balt.*, 866 F.3d 546, 556 (4th Cir. 2017) (quotation omitted). An officer may have probable cause for an arrest even when the officer's determination of probable cause rests on "reasonable mistakes of law." *Cahaly*, 796 F.3d at 408 (quoting *Heien v. North Carolina*, 574 U.S. 54, 62 (2014)). The probable cause analysis is an objective inquiry that looks to how a reasonable officer would respond; an officer's subjective motivation for making the arrest is irrelevant to the question of whether probable cause existed. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724–25 (2019). The definition of probable cause under Maryland law is essentially identical. *See Elliott v. State*, 10 A.3d 761, 771 (Md. 2010).

Maryland law permits an officer to effect a warrantless arrest of any person whom the officer reasonably believes to have committed a felony or misdemeanor, if the offense was committed within the officer's presence or view. Md. Code Ann., Crim. Proc. §2-202(b). There is no dispute that Meyler's conduct occurred within the view of the arresting officer.

Here, Meyler was arrested on charges of (1) interference with a police animal, and (2) disobeying a lawful order. The Defendants contend that the arrests were reasonable because probable cause existed to arrest Meyler on either of these charges. At summary judgment, once the Court has viewed the evidence in the light most favorable to the plaintiff, "the question of whether the officer's actions were reasonable is a question of pure law." *Henry v. Purnell*, 652

11

F.3d 524, 531 (4th Cir. 2011).

### 1.  *Interference with Police Animal Ordinance*

Turning first to the charge of interference with a police animal, the relevant Ocean City

municipal ordinance, entitled "Interference with police animals prohibited," provides as follows:

(a) It shall be unlawful for any person to willfully torment, beat, kick, strike, injure
or otherwise mistreat any animal owned by the Ocean City Police Department
or willfully interfere with the lawful performance of such animal in a police
activity.

(b) It shall be unlawful for any person to willfully touch any such animal owned by
the Ocean City Police Department, in any manner, after being directed not to
do so by a police officer.

(c) Any offender who violates the provisions of this section shall, upon conviction
thereof, be deemed guilty of a misdemeanor.

Code of the Town of Ocean City, Md. § 6-2.

The parties agree that the relevant provision is subsection (a), in particular the clause

prohibiting the "willful[] interfere[nce] with the lawful performance of [an Ocean City Police

Department] animal in a police activity." (*See* ECF No. 36-1 at 3; ECF No. 39-1 at 11.)  The

parties do not dispute that Moose was an animal owned by the Ocean City Police Department.

They disagree, however, on what actions constitute willful interference.

When interpreting a state statute, a federal court must "apply the statutory construction

rules applied by the state's highest court." *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300

(4th Cir. 2009).  The Supreme Court of Maryland (formerly the Court of Appeals of Maryland)[6]

"follows the general principles of statutory interpretation." *Johnson v. Mayor & City Council of

Balt.*, 61 A.3d 33, 38 (Md. 2013).  If the statutory language is clear and unambiguous, and

---

[6] For consistency, the Court will refer to Maryland's highest court as the Supreme Court of Maryland throughout this
Memorandum, even when the Court references cases decided by that court when it was called the Court of Appeals
of Maryland.

consistent with the broad purpose of the legislation, then the "inquiry is at an end." *Id.* (quotation omitted). If the statute is ambiguous, then a court "seek[s] to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based." *Id.* (quotation omitted). When a statutory term is not defined, a Court should assign the word its "ordinary meaning," which may require consulting dictionaries and considering the meaning of the word in its context. *Fusaro v. Howard*, 472 F. Supp. 3d 234, 263 (D. Md. 2020) (quoting *Balt. City Det. Ctr. v. Foy*, 197 A.3d 1, 11 (Md. 2018)).

Turning to the meaning of "willful interference," the parties have not directed the Court to any caselaw construing this exact provision. However, Maryland courts have previously spoken to the meaning of willfulness. Under Maryland law, an act is generally considered willful if it "is committed voluntarily and intentionally." *Kim v. Md. State Bd. of Physicians*, 32 A.3d 30, 42 (Md. 2011). The actor need not commit the action maliciously or with the knowledge that the action is in violation of the law. *Id.* at 42–43; *see also Deibler v. State*, 776 A.2d 657, 665 (Md. 2001).

The Parties have not directed the court to any Maryland caselaw interpreting the word "interference" in either the provision at issue or any other. Therefore, the Court will employ the tools of statutory construction described above.

In ordinary language, "to interfere" means "to enter into or take a part in the concerns of others," or "to interpose in a way that hinders or impedes." *Interfere*, Merriam-Webster's Collegiate Dictionary (11th ed. 2020); *see also Interference*, Black's Law Dictionary (11th ed. 2019) ("[t]he act or process of obstructing normal operations or intervening or meddling in the affairs of others"). The Court sees no reason to depart from the ordinary language here.

Read in context, the "meddling in another's affairs" meaning is inapposite when referring to an animal. The better reading is that one "interferes" with the lawful performance of a police

13

animal when one obstructs, hinders, or otherwise frustrates that animal's performance. However, Meyler argues that this broad definition is limited to only types of interference involving mistreatment by the application of the canon of statutory interpretation known as *ejusdem generis*.

*Ejusdem generis* "instructs that, when general words follow the enumeration of specific items in a list, the general words apply 'only to other items akin to those specifically enumerated.'" *Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 388 (4th Cir. 2018) (quoting *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980)). This canon, which is recognized by the Maryland courts, is premised on "the supposition that if the legislature had intended the general words to be construed in an unrestricted sense, it would not have enumerated the specific things." *In re Wallace W.*, 634 A.2d 53, 56 (Md. 1993) (quotation omitted). The use of *ejusdem generis* thus "save[s] the legislature from spelling out in advance every contingency in which the statute should apply." *Id.* (quotation omitted). In Maryland, courts apply *ejusdem generis* "more strictly in the context of penal statutes . . . since penal statutes shall be narrowly construed." *Id.* (quotation omitted). That said, a court should not invoke *ejusdem generis* when doing so would "subvert" the "obvious purpose" of a statute. *Tribbitt v. State*, 943 A.2d 1260, 1271 (Md. 2008) (quotation omitted).

> The doctrine of *ejusdem generis* applies when the following conditions exist: (1) the statute contains an enumeration by specific words; (2) the members of the enumeration suggest a class; (3) the class is not exhausted by the enumeration; (4) a general reference supplementing the enumeration, usually following it; and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires.

*Id.* (quoting *Wallace W.* at 55–56).

Section 6-2(a) contains two clauses. The first clause prohibits the willful *mistreatment* of any Ocean City Police Department animal; the second clause prohibits the willful *interference* with the lawful performance of an Ocean City Police Department animal in a police activity.

14

Application of *ejusdem generis* is appropriate with respect to the phrase "otherwise mistreat" at the end of the first clause. Because the previous words all refer to actions that inflict physical injuries or serious psychological distress on an animal, it is reasonable to conclude that "mistreat" refers only to mistreatment that inflicts similar kinds of injury.

However, it makes less sense to apply *ejusdem generis* to the second clause to also limit "interfere" to the same extent as "mistreat." If "interfere" is limited to cover the same types of activities as "mistreat," then the entirety of the second "interference" clause would be superfluous. Maryland courts construe statutory language "as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Mayor & City Council of Balt. v. Thornton Mellon, LLC*, 274 A.3d 1079, 1098 (Md. 2022) (quotation omitted). Thus, here the Court should, if possible, adopt an interpretation of the second clause that gives it an independent meaning from the first clause. *See id.* at 1099 (declining to interpret a statute in a way that would make two clauses have an identical meaning).

The first clause contains an absolute prohibition on willfully inflicting physical harm or serious psychological injury on a police animal. The second clause, by contrast, prohibits *any* willful action, so long as that act interferes with the lawful performance of an animal in a police activity. Construing the statute in this way makes sense. The first clause prohibits inflicting serious harm on a police animal, regardless of the effect (if any) on police activity, whereas the second clause covers more minor transgressions, but only if these actions have an effect on the animal's performance of a lawful police activity.

Thus, the statute's prohibition on "willfully interfer[ing]" with a police animal is not limited to actions similar in kind to tormenting, beating, kicking, striking, or injuring the animal. It also includes minor transgressions such as distracting or annoying an animal, so long as the act

is (1) willful and (2) interferes with the animal's lawful performance of a police activity. Interference, in turn, has its ordinary meaning as an act that obstructs, hinders, or impedes.

### 2. *Application of Police Animal Ordinance to Meyler's Conduct*

Here, even when viewing the facts in the light most favorable to Meyler, Foreman could have reasonably concluded that Meyler had willfully interfered with Moose's performance in a lawful police activity. Accordingly, probable caused existed for Foreman to arrest Meyler.

First, Foreman could reasonably have concluded that Meyler's actions were willful. There is no assertion that Meyler made the clicking noises involuntarily. Moreover, although a reasonable jury could conclude that Meyler was trying to be friendly toward the horse rather than upset it, there is no dispute that Meyler made the noises with the intention that Moose would hear and recognize them. (*See* Meyler Dep. at 61 ("I turned around towards the horse and I made a click sound – click, click. Nice horsey."); *id.* at 65 (explaining that he has "see[n] people do it [*i.e.*, make clicking noises] to get the attention of the animal").) Furthermore, Foreman repeatedly warned Meyler not to continue making the clicking sounds, but nevertheless Meyler continued doing so. Meyler does not contend that he was unable to hear or understand these warnings from the officer. Under these circumstances, Foreman could reasonably have concluded that Meyler's degree of intentionality satisfied the willfulness element. *See Kim*, 32 A.3d at 43 (explaining that willfulness does not require a showing of malice).

Second, Foreman could reasonably have concluded that Meyler was interfering with Moose's performance of a lawful police activity. Seconds after Meyler first made the clicking noise, Moose appeared to respond by trying to move forward, and Foreman had to pull on Moose's reins to keep Moose still. Although there may be a factual dispute whether Moose was in fact responding to Meyler's clicking or whether Moose's movement was unrelated, Foreman could

have reasonably concluded in the moment that Moose reacted to Meyler's clicks. Moreover, Foreman has produced unrebutted testimony that mounted police officers use clicking noises for commands:

> Mounted officers use these types of cues to communicate with their horses. Different types of clicks and kissing sounds are used for many different commands. They can be used to make the horse move forwards, backwards, and side-to-side. They are also used to get the horses [*sic*] attention, so that they are on the look-out for obsticles [*sic*] that they may need to maneuver around or over[.]"

(ECF No. 36-11 at 9.) In the circumstances of the July 2022 incident, Foreman could have reasonably concluded that Meyler's clicking sounds were intended to interfere with Moose's lawful performance by distracting Moose and preventing the horse from standing still while the officer attempted to respond to the scene. If Moose were distracted and unable to stand still, that would have hindered the officer's ability to respond to the situation safely and appropriately.[7]

Finally, even if Foreman lacked probable cause to arrest Meyler for *actual* interference with a police animal, he would at least have had probable cause to arrest him for *attempted* interference with a police animal. "Under Maryland common law, the attempt to commit a crime is, itself, a separate misdemeanor." *State v. North*, 739 A.2d 33, 35 (Md. 1999). The elements of attempt are "[1] intent to commit a particular offense coupled with [2] some overt act in furtherance of the intent which goes beyond mere preparation." *Cox v. State*, 534 A.2d 1333, 1335 (Md. 1988). Because attempt is a common law crime, the legislature need not expressly designate attempt as a crime in the statutory code; instead, "[t]he crime of attempt expands and contracts and is redefined

---

[7] The fact that the charges against Meyler were subsequently voluntarily dismissed before trial has no bearing on the question of whether there was probable cause for the arrest. *See Sennett v. United States*, 667 F.3d 531, 537 (4th Cir. 2012) (stating that the fact that a suspect was never charged with a crime does not defeat the existence of probable cause at the time of the arrest); *cf. DeFillippo*, 443 U.S. at 36 (holding that the "fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest").

commensurately with the substantive offense."[8]  *Id.*  Here, Foreman had probable cause to conclude that Meyler's deliberate and continued clicking noises evinced both an intent to interfere with Moose's lawful performance, and constituted an overt act in the furtherance of that intent.

For these reasons, the Court concludes that there was probable cause to arrest Meyler for violating the police animal interference ordinance.[9]  Moreover, even assuming *arguendo* that Foreman's conclusion that Meyler violated the ordinance was legally erroneous in some way, he would still have had probable cause to effect the arrest, as it does not appear that any mistake of law was unreasonable. *See Cahaly*, 796 F.3d at 408.

A lawful arrest requires only probable cause for a single criminal offense, and the Court has determined that such probable cause existed for arresting Meyler based on the police animal interference ordinance.  While Foreman may not have followed modern de-escalatory policing practices or treated Meyler with the appropriate amount of respect, his actions in effectuating the arrest on July 1, 2022 were not unlawful.  Accordingly, the Court need not address the question of whether probable cause existed for any other violations, including a violation of the Maryland state law prohibiting disobeying a lawful order for preventing a disturbance to the public peace, Md. Code Ann., Crim. Law § 10-201(c)(3).  The Court notes, however, that it doubts whether probable cause to arrest Meyler for that offense existed.[10]

---

[8] Two exceptions, not relevant here, in which attempt is not a crime are when (1) the substantive crime has no *mens rea* requirement, and (2) when the substantive crime is itself in the nature of an attempt, such as an assault. *Lane v. State*, 703 A.2d 180, 186 (Md. 1997).

[9] The fact that people were allowed to pet police horses in other contexts—in particular, in contexts where officers were not in the midst of responding to a call—is similarly inapposite.  Foreman had probable cause to believe that, in the *particular* circumstances of the July 2022 incident, Meyler's continued insistence on making clicking noises was disruptive to Moose's lawful performance as a police horse and therefore unlawful.  Lastly, the record also contains unrebutted testimony that members of the public were frequently prohibited from interacting with the police horses, for example when civilians appeared to be drunk or when officers were responding to a call. (*See, e.g.*, Norris Dep. at 45; Laughlin Dep. at 23–25.)

[10] Section 10-201(c)(3) does not criminalize all instances of willful disobedience of a lawful police order; instead, the disobeyed order "must [have been] intended to prevent someone from inciting or offending others." *Okwa v. Harper*,

Having determined that there was probable cause to support Meyler's arrest, the Court now turns to the substance of each of his claims.

## C. Section 1983 (Count I)

Count I, which alleges deprivation of Meyler's constitutional rights pursuant to 42 U.S.C. § 1983, is brought solely against Officers Foreman and Norris, not against the City. (*See* ECF No. 1 at 8.) Meyler alleges that his First, Fourth, and Eighth Amendment rights were violated. (*Id.* at ¶ 29.) Section 1983 provides a cause of action for private persons to seek relief against state actors who violate their federal constitutional or statutory rights. *Filarsky v. Delia*, 566 U.S. 377, 380 (2012). However, when a plaintiff brings a § 1983 claim against government officials in their individual capacity, the suit will be barred by the doctrine of qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Barrett v. PAE Gov't Servs., Inc.*, 975 F.3d 416, 528 (4th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)); *King v. Riley*, 76 F.4th 259, 264–65 (4th Cir. 2023).

Here, the Court will grant summary judgment in Defendants' favor, as it holds that Defendants Foreman and Norris did not violate the First, Fourth, or Eighth Amendments and that, in any event, even if there was a violation they are entitled to qualified immunity.

### 1. First Amendment

Meyler argues that he had a clearly established First Amendment right to make clicking sounds toward Moose, notwithstanding Foreman's orders to the contrary. (ECF No. 39-1.) However, even assuming that Meyler's First Amendment rights were violated, Foreman and Norris

---

757 A.2d 118, 185 (Md. 2000). Here, it is not clear that a reasonable officer could have believed that Meyler's clicking noises were inciting or offending others. *See Jackson v. State*, No. 1506, 2023 WL 8479221, at *3 (Md. Ct. App. Dec. 7, 2023) (explaining that the "mere presence" of other people at the scene "is not in itself sufficient to support a conviction" under the statute).

would be entitled to qualified immunity as his rights were not clearly established at the time of the arrest.

"The inquiry as to whether the law is clearly established is a demanding one." *Allen v. Cooper*, 895 F.3d 337, 356 (4th Cir. 2018), *aff'd*, 589 U.S. 248 (2020). "The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quotations and citations omitted) (emphasis in original).

As a general principle, individuals have a First Amendment right "verbally to oppose or challenge police action without thereby risking arrest," *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987), and furthermore, "[i]t is well established that the First Amendment protects expressive conduct as well as pure speech," *Willis v. Town of Marshall*, 426 F.3d 251, 257 (4th Cir. 2005). However, to hold that these general principles sufficed to put a reasonable officer on notice that Meyler's specific actions were constitutionally protected would be to require an officer "to reason backward from case law at a high level of generality to determine whether his conduct violated a constitutional right," which this Court cannot do. *Harris v. Pittman*, 927 F.3d 266, 281 (4th Cir. 2019) (quotation omitted).

Here, Meyler has not pointed to a single case involving an arrest made under Ocean City's police animal interference ordinance, or, for that matter, any case *anywhere* involving any claims of wrongful arrest related to alleged interference with police animals. Nor has he pointed to any cases involving the application of First Amendment rights to human-animal interactions. When a plaintiff fails to "identif[y] a single precedent—much less a controlling case or robust consensus of cases—finding a [constitutional] violation under similar circumstances," he will likely be unable

to show that the purported right was clearly established at the time. *Wesby*, 583 U.S. at 65. Nor is this "'the rare obvious case' where a general standard can clearly establish the answer." *Garrett v. Clarke*, 74 F.4th 579, 589 (4th Cir. 2023) (quoting *Wesby*, 583 U.S. at 64)). Accordingly, Foreman and Norris are entitled to qualified immunity with respect to Meyler's First Amendment claim, and the Court will grant summary judgment in their favor. *See Crouse v. Town of Moncks Corner*, 848 F.3d 576, 584 (4th Cir. 2017) ("Because we find that the law was not clearly established here, we will not reach the other step in the analysis—whether a constitutional violation actually occurred.").

### 2. *Fourth Amendment*

As discussed above, the Court has determined that Meyler's arrest during the July 2022 incident was supported by probable cause. As such, there was no violation of Meyler's Fourth Amendment rights. *See Wesby*, 583 U.S. at 56.

Meyler argues however, that even if there was probable cause, Foreman was actually motivated by racial animus and so there was a constitutional violation. He has provided evidence that, in other contexts, white people have been allowed to pet police horses in Ocean City, which he believes shows (1) that he has a general right to interact with Ocean City police horses, and (2) that white people were treated more favorably than Black people in interactions with mounted police officers. (*See* ECF Nos. 39-4 (photograph of two white civilians petting a police horse in Ocean City); ECF No. 39-5 (video of mostly white civilians petting police horses in Ocean City); Foreman Dep. at 26–27 (ECF No. 39-21 at 8) (Foreman stating that members of the public are regularly allowed to interact with the horses); Norris Dep. at 44 (ECF No. 39-22 at 44) (Norris stating that he has seen people pet the horses on numerous occasions); Laughlin Dep. at 23 (ECF No. 39-23 at 7) (Officer Laughlin saying that people are sometimes allowed to pet the horses);

Meyler Dep. at 66; Bernier Dep. at 60–61.)

Meyler also points to additional evidence that he believes shows that his arrest was unlawful because he was the victim of anti-Black racial profiling. Meyler offers his sworn statement that "he believe[s] he was wrongfully arrested because Plaintiff is a young Black man." (ECF No. 39-9 at 10.) Bernier also stated, both contemporaneously and in his deposition testimony, that he believed Meyler was unfairly targeted because he was Black. (Bernier Dep. at 85.) Meyler further argues that Foreman's statement that he should "go back to Jamaica" is evidence of racial bias. (ECF No. 39-1 at 18.)

This evidence, however, is inapposite, because even assuming that Foreman was acting out of racial animus, that is irrelevant to the probable cause analysis. *See Sennett*, 667 F.3d at 536 (stating that the "subjective mindset" of an officer "do[es] not factor into the probable cause calculus"). In the Fourth Amendment context, the Court's role is not to assess the professionalism of the officers or the wisdom of their choices, but only the bare lawfulness of the seizure. When an officer makes an arrest based on probable cause, there is no Fourth Amendment violation, even if the officer was subjectively motivated by impermissible factors such as race. *See Whren v. United States*, 517 U.S. 806, 819 (1996) (holding that a traffic stop was reasonable under the Fourth Amendment when it was supported by probable cause, notwithstanding allegations that the officers were subjectively motivated by race); *Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001) (holding that an officer's subjective intentions play no role in determining whether a custodial arrest, supported by probable cause, violated the Fourth Amendment); *see also Seabrook v. Moncks Comer PD*, Civ. No. 2:13-3548, 2014 WL 5025832, at *5 (D.S.C. Oct. 6, 2014) (holding that officers' subjective racial motivation was irrelevant to the question of whether an arrest was reasonable under the

22

Fourth Amendment).[11]

For these reasons, Defendants are entitled to summary judgment on Meyler's Fourth Amendment claims.

### 3. *Eighth Amendment*

Meyler's Eighth Amendment claim is facially deficient, as the protections of the Eighth Amendment attach only after an individual has already been found guilty of a criminal offense. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 258 (D. Md. 2020) (citing *Ingraham v. Wright*, 430 U.S. 651, 671–72 n.40 (1977)). The Eighth Amendment is inapplicable to the circumstances of Meyler's arrest. *See Lytes v. Smith*, 11 F. Supp. 3d 527, 538 (D.S.C. 2014) (holding, in the context of a wrongful arrest claim, that the "Eighth Amendment does not apply in this case" because the plaintiff had not been convicted of any crime). Accordingly, the Court will grant summary judgment in Defendants' favor with respect to Meyler's Eighth Amendment claim.

### D. Maryland Declaration of Rights (Count II)

The Maryland courts recognize a cause of action for damages when an individual is deprived of his or her liberty in violation of the Maryland Constitution. *Okwa v. Harper*, 757 A.2d 118, 140 (Md. 2000). Maryland courts do not accord qualified immunity to government officials accused of violating the state Constitution. *Id.* Moreover, "Maryland law provides no immunity for municipalities and other local government entities from suits based upon violations of state constitutional rights." *Ashton v. Brown*, 660 A.2d 447, 462 (Md. 1995); *see also Mendoza v. Anne*

---

[11] To be sure, an officer's decision to subject a plaintiff to unfavorable treatment on the basis of the plaintiff's race *would* constitute a violation of the plaintiff's Equal Protection rights guaranteed by the Fourteenth Amendment. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1731 (2019) (Gorsuch, J., concurring) ("Everyone accepts that a detention based on race, *even one otherwise authorized by law*, violates the Fourteenth Amendment's Equal Protection Clause.") (emphasis in original). But Plaintiff has not even mentioned the Equal Protection Clause in his briefing on Summary Judgment, nor does he make any allegation of an Equal Protection or Fourteenth Amendment violation in the Complaint. This Court cannot and will not make Plaintiff's arguments for him. *See Smith v. Wormuth*, Civ. No. JRR-20-00419, 2024 WL 1012887, at *6 (D. Md. Mar. 8, 2024).

23

*Arundel Cnty.*, Civ. No. JRR-23-01383, 2024 WL 1243839, at \*15 (D. Md. Mar. 22, 2024) (collecting cases). Meyler brings claims under Articles 24 and 26 of the Maryland Declaration of Rights. (ECF No. 1 at 3.)

The Article 26 claim is functionally identical to the Fourth Amendment claim; the Court must view the facts in the light most favorable to the plaintiff and determine whether, as a matter of law, a reasonable officer could have concluded that there was probable cause for the arrest. *See Washington v. State*, 287 A.3d 301, 336–37 (Md. 2022) ("[W]e interpret Article 26 *in pari materia* with the Fourth Amendment, meaning that the protections under Article 26 are coextensive with those under the Fourth Amendment."); *Ross*, 899 F. Supp. 2d at 431 ("Probable cause therefore defeats not only [Plaintiff]'s §1983 claim, but also [his] Article 26 claim."). As discussed above, the Court has concluded that there was probable cause to arrest Meyler for violating the Ocean City ordinance against interference with police animals. Accordingly, Defendants are entitled to summary judgment on Meyler's Maryland Article 26 claims.

However, Defendants advance no argument in their briefing whatsoever as to why they are entitled to summary judgment with respect to Meyler's Article 24 claim. As the moving party, Defendants bear the burden of showing that they are entitled to summary judgment. *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). Because Defendants have failed to raise any argument as to why they are entitled to summary judgment on Meyler's Article 24 claim, they have failed to meet their initial burden under Rule 56 and their Motion must be denied with respect to that claim. *See Walker v. DDR Corp.*, Civ. No. JMC-17-01586, 2019 WL 1434229, at \*7 (D.S.C. Mar. 29, 2019) (holding that "[b]ecause Defendants have failed to challenge Plaintiff's claim for [negligence] and the matter has not been directly briefed, this claim does not warrant the entry of summary judgment" and collecting cases).

24

For these reasons, the Court will grant summary judgment with respect to Plaintiff's Article 26 claim, but deny summary judgment with respect to his Article 24 claim.

### E. False Arrest and False Imprisonment (Counts III and IV)

In Maryland, the common law torts of false arrest and false imprisonment "are separate causes of action that share the same elements." *Dett v. State*, 869 A.2d 420, 441 (Md. Ct. Spec. App. 2005). The elements of both torts are "1) the deprivation of the liberty of another; 2) without consent; and 3) without legal justification." *Heron v. Strader*, 761 A.2d 56, 59 (Md. 2000). As the Supreme Court of Maryland has explained:

> The test of legal justification, in the context of false arrest and false imprisonment, is judged by the principles applicable to the law of arrest. Therefore, where the basis of a false imprisonment action is an arrest by a police officer, the liability of the police officer for false imprisonment will ordinarily depend upon whether or not the officer acted within his legal authority to arrest.

*Id.* (quotations and citations omitted).

The question of whether an arrest was made with or without legal justification or authority "has created some confusion in other courts." *Great Atl. & Pac. Tea Co. v. Paul*, 261 A.2d 731, 738 (Md. 1970). The confusion "arises because of the frequent statement that probable cause is not a defense to an action for false imprisonment but legal justification is." *Id.* However, while probable cause is not a defense *per se*, the question of whether an arrest was supported by probable cause will usually be crucial to the question of whether the arrest was legal justified. That is so because, as discussed above, Maryland law permits a police officer to make a warrantless arrest of an individual when he has probable cause to believe that that individual has committed a misdemeanor or felony in the officer's presence. Md. Code Ann., Crim. Proc §2-202(b). Thus, a plaintiff cannot establish the "without legal justification" element if the officer had probable cause to believe that the plaintiff was committing a misdemeanor in the officer's presence at the time of

25

the arrest. *See Ashton*, 660 A.2d at 473 (Md. 1995) (holding that if a police officer had probable cause to believe that a nightclub operator had committed a misdemeanor in the officer's presence, then "the police officer could have arrested the operator with lawful justification"); *Nalls v. Balt. Cnty.*, Civ. No. ELH-23-0183, 2024 WL 1140688, at *33 (D. Md. Mar. 15, 2024) ("[U]nder Maryland statutory law, probable cause may legally justify a warrantless arrest for a felony *and* a warrantless arrest for a misdemeanor.") (emphasis in original).

Here, it is undisputed that Meyler's conduct occurred in the presence of the Defendant police officers, and the Court has already concluded that they had probable cause to believe that Meyler was committing a misdemeanor in their presence. Accordingly, Meyler cannot show that his arrest was made without legal justification, and therefore Defendants are entitled to summary judgment with respect to Counts III and IV. *See Stutzman v. Krenik*, 350 F. Supp. 3d 366, 381 (D. Md. 2018) (holding that an arrest was justified—and that therefore the plaintiff failed to state a claim for false arrest under Maryland law—because the police officer had probable cause for believing that the plaintiff had committed a misdemeanor in the officer's presence); *Nalls*, 2024 WL 1140688, at *33 (concluding that the "essential question" for determining whether plaintiffs stated a claim for false arrest was whether there was probable cause for the arrest).

### F. Assault and Battery (Count V)

Under Maryland law, "[a]n assault is any unlawful attempt to cause a harmful or offensive contact with the person of another or to cause an apprehension of such a contact." *Smallwood v. Kamberger*, No. 3067, 2020 WL 4049719, at *25 (Md. Ct. Spec. App. July 20, 2020) (quoting *Cont'l Cas. Co. v. Mirabile*, 449 A.2d 1176, 1183 (Md. Ct. Spec. App. 1982)). And under Maryland law, "battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 735 A.2d 1096, 1099 (Md. 1999).

26

Just like with false imprisonment and false arrest, "assault and battery (when the force used is not excessive) can only occur when there is no legal authority or justification for the arresting officer's actions." *Hines v. French*, 852 A.2d 1047, 1055 (Md. Ct. Spec. App. 2004) (quotation omitted). Thus, "[a]n officer is not liable for battery for using a reasonable amount of force when effectuating a lawful detention or arrest." *Stutzman*, 350 F. Supp. 3d at 383 (citing *Ashton*, 660 A.3d at 471 n.24).

Here, Meyler does not contend that the police used excessive force in arresting him, but only that the arrest itself was unlawful.[12] When, as here, a plaintiff "ha[s] not asserted a cause of action based on alleged excessive force in making the arrest," then a plaintiff's "causes of action for assault and battery are . . . analytically dependent upon the cause of action for false imprisonment." *Ashton*, 660 A.2d at 471 n.24. As the court in *Ashton* explained, "[i]f the plaintiffs' arrests constituted a false imprisonment, then the physical force used in effectuating the arrests would give rise to a cause of action for assault and battery. Conversely, if the arrests themselves were not tortious, neither was the physical force used to effectuate them." *Id.*

Because the officers had legal authority to arrest Meyler, and because there is no allegation of excessive force, Defendants are entitled to summary judgment in their favor on the assault and battery claims. *See Carey v. Balt. Cnty.*, Civ. No. RDB-22-0782, 2022 WL 16951246, at *5 (D. Md. Nov. 15, 2022) (holding that a plaintiff failed to state a claim for assault and battery resulting from a traffic stop, because he failed to allege a lack of legal justification for the stop).

---

[12] In fairness, there is a single passing reference to excessive force in Count I of the Complaint (the § 1983 claim). (ECF No. 1 at 8.) But the phrase comes in the context of a conclusory statement that the Defendant police officers "deprived Plaintiff of rights secured to [him] by the Constitution of the United States, including but not limited to . . . his eight[h] amendment rights to be free from unjustified and excessive force[.]" (*Id.*) This allegation is not supported by any factual color, and Meyler makes no mention of excessive force in his briefing opposing the Summary Judgment Motion. (*See generally* ECF No. 39.) Moreover, the body camera footage in the record does not show any force being applied to Meyler beyond the amount necessary to effect the arrest, and Meyler does not argue otherwise. (*See* Foreman Video.)

27

### G. Malicious Prosecution (Count VI)

> The elements of malicious prosecution are: 1) a criminal proceeding instituted or continued by the defendant against the plaintiff; 2) without probable cause; 3) with malice, or with a motive other than to bring the offender to justice; and 4) termination of the proceedings in favor of the plaintiff.

*Heron*, 761 A.2d at 59. Here, it is undisputed that a criminal proceeding was initiated against Meyler, and that the charges against him were ultimately *nol prossed*. A *nol pros* is considered a termination in the plaintiff's favor for purposes of a malicious prosecution claim. *Hines*, 852 A.2d at 1057. Moreover, the Court will assume *arguendo* that there is a genuine dispute of fact as to whether either Foreman or Norris acted with malice. Nevertheless, Meyler's malicious prosecution claim fails because he cannot show that the proceeding against him was instituted without probable cause, as the Court has already explained. The fact that a prosecution ended in a *nol pros* does not determine whether there was probable cause for the arrest, especially when— as here—it is not apparent from the record why the case was *nol prossed*. *See id.* at 1058.

For these reasons, the Court will grant summary judgment in Defendants' favor on Count VI. *See Martin v. Conner*, 882 F. Supp. 2d 820, 846 (D. Md. 2012) (granting summary judgment in favor of defendants "[b]ecause the indisputable facts demonstrate as a matter of law that the officers had probable cause to seek the charges and lack of probable cause is an element of malicious prosecution").

## IV. DEFENDANTS' MOTION IN LIMINE

Defendants' Motion in Limine seeks to have the Court exclude the testimony of Meyler's proffered psychiatry expert, Dr. Theodore C. Osuala, from trial. (ECF No. 38.) This Motion will be denied as premature, since Meyler has not relied on Dr. Osuala's testimony in his summary judgment briefing, and motions in limine are generally ripe only after dispositive motions have been decided and the case has been scheduled for trial. *Burnett v. BJ's Wholesale Club*, Civ. No.

JKB-22-02840, 2024 WL 1014074, at *10 (D. Md. Mar. 8, 2024).

## V.    SUPPLEMENTAL JURISDICTION

As has been discussed above, the Court will be granting summary judgment in Defendants' favor with respect to all of Meyler's claims other than his claim under Article 24 of the Maryland Declaration of Rights. The Court must then consider whether to retain supplemental jurisdiction over the Article 24 claim.

Under 28 U.S.C. § 1367(c), when a court has dismissed all federal claims from a case, it has discretion to decline to exercise supplemental jurisdiction over the remaining state-law claims. 13D Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 3567.3 (3d ed. 2023). The Supreme Court has explained that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). As a result, in the usual case, "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *Id.* Here, Meyler's Article 24 claims are not so closely tied to a matter of federal policy as to justify retaining the claims in this Court. Declining to exercise supplemental jurisdiction is especially appropriate here, when neither party has briefed the Article 24 issue at all, meaning that no substantial resources have yet been invested in litigating the issue in this Court. Instead, the better course of action is to let the Maryland courts determine the proper application of Maryland constitutional law to the facts of this case. *See Ramsay v. Sawyer Prop. Mgmt. of Md., LLC*, 948 F. Supp. 2d 525, 537 (D. Md. 2013). Accordingly, Meyler's claims relating to Article 24 of the Maryland Declaration of Rights will be dismissed, without prejudice to his refiling such claims in state court.

## VI.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment (ECF No. 36). In particular, the Motion will be denied with respect to Meyler's claims in Count II under Article 24 of the Maryland Declaration of Rights, and will be granted in all other respects. The Court will also (1) grant Defendants' Motion for Leave to File Physical Exhibits (ECF No. 37); (2) deny as unripe Defendants' Motion in Limine (ECF No. 38) (3) grant Meyler's Motion for Leave to File Physical Exhibits (ECF No. 40); (4) dismiss Meyler's Article 24 claims without prejudice to his refiling those claims in state court; (5) direct the clerk to update the case caption; and (6) direct the clerk to close this case.

A separate order will issue.

DATED this _____4_____ day of June, 2024.

BY THE COURT:

James K. Bredar
United States District Judge